# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 50230 | **DATE** | 3/18/2002 |
| **CASE TITLE** | | Molina vs. Cooper, et al. | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendants' motion for summary judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached Memorandum Opinion and Order, defendants' motion for summary judgment is granted. This case is hereby dismissed in its entirety.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| X | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | MAR 18 2002 | | |
| X | Docketing to mail notices. | | date docketed | | |
| X | Mail AO 450 form. | | docketing deputy initials | | |
| X | Copy to judge/magistrate judge. | | 3-18-02 | | |
| /LC | courtroom deputy's initials | 02 MAR 18 PM 2: 32 | date mailed notice | | |
| | | FILED-WD | Date/time received in central Clerk's Office | mailing deputy initials | |

| | |
|---|---|
| RAUL MOLINA, JACKIE MOLINA, and CHAD and JOSHUA MOLINA, by and through their parents and next friends, Raul and Jackie Molina, ) ) ) ) ) Plaintiffs, ) ) v. ) ) GARY COOPER, ROBBIE DAIL, JAMES KERNS, ) CLINT THULEN, KEVIN HOVORKA, JOSEPH ) FIORINI, JOHN SIMONTON, TROOPER WUJEK, ) TROOPER LONGO, TROOPER PLOMERO, ) TROOPER SHIMIZU, S/A VALENTINE, ) SERGEANT LINDENMAN, TROOPER SEBASTIANO, ) TROOPER BAIN, TROOPER GARIBAY, and ) TROOPER ODENTHAL, ) ) Defendants. ) | No. 00 C 50230 |

## MEMORANDUM OPINION AND ORDER

### I.   INTRODUCTION

Plaintiffs, Raul, Jackie, Chad, and Joshua Molina, have filed a six-count first-amended complaint against defendants, all of whom are various officers with the Illinois State Police, local police agencies, or police task forces (collectively referred to as "the officers").  All defendants are sued in their individual capacities.  The Molinas allege claims under 42 U.S.C. § 1983 for the use of excessive force (Count I), false arrest (Count II), unlawful search (Count III), "selective enforcement" (Count IV), and malicious prosecution (Count V), as well as a supplemental state law claim for malicious prosecution (Count

VI). The court has original jurisdiction over Counts I - V based on 28 U.S.C. § 1331 and supplemental jurisdiction over Count VI based on 28 U.S.C. 1367(a). Venue is proper under 28 U.S.C. § 1391(b). Before the court is defendants' motion for summary judgment, filed pursuant to Federal Rule of Civil Procedure 56.

## II.  **BACKGROUND**

Shortly after midnight on July 6, 1998, the officers executed a search warrant on the Molinas' home in Sterling, Illinois. (LR 56.1(a) ¶ 1) With reason to believe Raul Molina fit some of the criteria to make the search "high risk," such as being a suspected drug dealer and gang member, possibly having weapons inside the house, and having a criminal history involving violence, a "tactical response team" ("TRT"), or SWAT team, participated in the search. (Id. ¶¶ 21, 22, 56-58) The TRT's job was to make the initial entry into the Molina residence and then secure it for the investigators conducting the actual search. (Id. ¶ 59) Officer Simonton, the team leader for the TRT that night, testified in his deposition that, before the TRT forcibly entered the Molina home, Trooper Bain knocked on the front door and called out three times, "Illinois State Police search warrant, open the door!" (Id. ¶ 63) Although the Molinas dispute this, the only evidence they have to do so is the testimony of Jackie Molina, who stated she was asleep in her bedroom when the officers arrived and awoke to the sound of screaming and yelling, although she could not make out what was

-2-

being said.  (LR 56.1(b) ¶¶ 89-90)

With nobody answering its calls, the TRT broke in the front door and entered the Molina home.  (LR 56.1(a) ¶ 62)  In the meantime, Jackie had jumped out of bed and was walking towards the hallway when she was grabbed by a TRT officer and shoved to the floor.  (Id. ¶ 3)  While lying on the floor, Jackie testified that one of the TRT officers pointed a gun at her head.  (Id. ¶ 4; LR 56.1(b) ¶ 94)  She was then handcuffed and detained in the living room along with Chad and Joshua, who were thirteen and ten years old at the time, respectively.  (LR 56.1(b) ¶ 93)

Raul was at work at the time of the search, although officer Cooper testified in his deposition he previously had obtained information that Raul's shift ended at 11:00 p.m. and would be home when the warrant was executed.  (LR 56.1(a) ¶ 41; LR 56.1(b) Def. Reply ¶ 26)  Believing Raul was indeed home and that he might be in the basement and armed, the TRT threw two "flash-bang" or distraction devices into the basement to temporarily distract him.  (LR 56.1(a) ¶¶ 65, 66, 68, 71)  After determining Raul was not at home and securing the rest of the residence, the TRT called in the investigating officers to conduct the search.  (Id. ¶ 67)

Among other things, the search revealed a set of brass knuckles (what the Molinas insist is actually a belt buckle), a switch blade knife found in Jackie's dresser drawer, fireworks, three round plastic tennis ball size items filled with some type

-3-

of explosive substance, and a small digital scale commonly used by drug dealers. (Id. ¶¶ 8, 15-17, 20, 35-37, 42; LR 56.1(b) ¶ 103) The scale had on it what various officers described as a "dust," "residue," "minute amount of white substance," or a "white powdery substance" that was "like a haze." (LR 56.1(a) ¶¶ 36, 43; LR 56.1(b) Def. Reply ¶ 28) The officers believed the substance might be cocaine but did not field test it because they would not have had any left to send to the laboratory. (LR 56.1(a) ¶¶ 36, 43) None of the Molinas were arrested that night.

As it turned out, the lab test on the residue from the scale confirmed it was cocaine. (Id. ¶ 78) (Two other items which had field tested positive for cocaine on the night of the search came back negative. (LR 56.1(b) ¶¶ 56, 57)) Jackie and Raul were subsequently arrested on October 2, 1998, on charges arising out of the July 6 search. (LR 56.1(a) ¶¶ 11, 18) Together they were charged with possession of a controlled substance (the cocaine residue), three counts of unlawful use of weapons (an explosive substance over one quarter ounce, the brass knuckles, and the switch blade knife), and possession of drug paraphernalia (the digital scale). (Def. Exh. 7) Almost a year later, in September 1999, the state dismissed all charges against the Molinas.

### III.  **ANALYSIS**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of

-4-

material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Chavez v. Illinois State Police, 251 F.3d 612, 635 (7th Cir. 2001). To determine whether a genuine issue of material fact exists, the court views the evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. See Chavez, 251 F.3d at 635. Only when a reasonable jury could find for the nonmoving party based on the record as a whole will there be a "genuine issue for trial." See id.

As all of the officers are sued in their personal capacities and have raised the defense of qualified immunity, the court engages in a two-step inquiry. First it considers the "threshold question" of whether, taking the facts in the light most favorable to the Molinas, the officers' conduct violated the Molinas' constitutional rights. See Saucier v. Katz, 533 U.S. 194, --, 121 S. Ct. 2151, 2156 (2001). If such a violation could be made out on a favorable view of the evidence, then the next, sequential step is to ask whether the constitutional right at issue was clearly established, such that a reasonable official would understand that what he was doing violated that right. See id.; Morrell v. Mock, 270 F.3d 1090, 1094 (7th Cir. 2001). Although it is an affirmative defense, the burden of defeating the assertion of qualified immunity rests with the Molinas. See Sparing v. Village of Olympia Fields, 266 F.3d 684, 688 (7th Cir. 2001).

Before turning to the merits of the Molinas' claims, the court must clarify exactly what some of those claims are. Specifically, the parties have discussed the Molinas' malicious prosecution claims under a tripartite formula the Seventh Circuit has recently (though before the officers filed their motion for summary judgment) discarded. See Newsome v. McCabe, 256 F.3d 747, 751 (7th Cir. 2001). In Newsome, the court explained malicious prosecution is not available as an independent constitutional tort, but must be analyzed under the "language of the Constitution itself," such as the Fourth or Fourteenth Amendment. See id. at 751-53. With that in mind, rather than follow whatever labels the Molinas have attached to their claims, the court will organize its opinion according to the relevant constitutional amendment under which each claim falls.

## A. **Fourth Amendment**

### 1. **Search warrant (Count III)**

The Molinas' primary contention on summary judgment is that the warrant upon which the July 6 search was premised was without probable cause because Cooper, who applied for the warrant, relied on information provided by two informants, Jason Villa and Jason Ramirez, he knew to be false and misleading. Affidavits supporting search warrants are presumed valid, so to prevail on this claim the Molinas must make a "substantial preliminary showing" that Cooper knowingly and intentionally, or with reckless disregard for the truth, included a false statement in

-6-

the warrant affidavit, and the false statement was necessary to
the finding of probable cause.  See <u>Franks v. Delaware</u>, 438 U.S.
154, 155-56 (1978); <u>United States v. Jones</u>, 208 F.3d 603, 607
(7th Cir. 2000); <u>Perlman v. City of Chicago</u>, 801 F.2d 262, 264
(7th Cir. 1986), <u>cert. denied</u>, 480 U.S. 906 (1987).  This same
standard also applies to the intentional or reckless withholding
or omission of material information.  See <u>Supreme Video, Inc. v.
Schauz</u>, 15 F.3d 1435, 1441 (7th Cir. 1994); <u>United States v.
McNeese</u>, 901 F.2d 585, 594 (7th·Cir. 1990), <u>overruled on other
grounds by United States v. Westmoreland</u>, 240 F.3d 618 (7th Cir.
2001).  But only where "the warrant application is so lacking in
indicia of probable cause as to render official belief in its
existence unreasonable will the shield of immunity be lost."
<u>Forman v. Richmond Police Dep't</u>, 104 F.3d 950, 964 (7th Cir.)
(quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 344-45 (1986)), <u>cert.
denied</u>, 522 U.S. 997 (1997).

The court initially agrees with the Molinas that the
information attributed to Villa in the affidavit was not
particularly useful and, even assuming it was, there might be
some questions of fact as to whether Cooper had reasons to doubt
the veracity of Villa's allegations.  See <u>Jones</u>, 208 F.3d at 607.
Even the officers discount the statements from Villa as merely
background information.  (LR 56.1(a) ¶ 84)  The court thus
disregards the facts Cooper attributed to Villa in his affidavit
as unnecessary to the probable cause finding and will focus

instead on whether the remaining information in Cooper's affidavit by itself was enough to support probable cause. See Forman, 104 F.3d at 964 (tainted information in warrant affidavit will not invalidate warrant if untainted information, by itself, establishes probable cause).

Turning to Jason Ramirez, the Molinas argue Cooper failed to disclose on his warrant application certain relevant facts and "inconsistencies" from Ramirez' two taped interviews with Cooper and officer Dail (given two months apart) that would have affected the probable cause determination. In the court's opinion, the omissions and inconsistencies the Molinas point to are either insignificant or taken out of context so as to distort the actual meaning. For example, the Molinas complain Cooper did not explain in his warrant affidavit that Ramirez gave his two interviews with the hope of receiving favorable treatment on his own pending criminal charges. While Ramirez' motive to implicate others in criminal activities may be a factor in the probable cause inquiry, other factors suggest the information he provided was sufficiently reliable: (1) Ramirez' statements were against his own penal interest as he also implicated himself in a long-running and highly profitable drug conspiracy, with Raul Molina at the head and Ramirez acting as a runner; (2) his accounts of Raul's involvement in the drug conspiracy were based on first-hand observation, including his description of how he and another individual would pick up cocaine directly from Raul at Raul's

home in Sterling, how he (Ramirez) had been inside the Molina residence on several occasions, had seen up to a kilogram of cocaine in the basement, and knew Raul kept a ledger of his drug records in the basement; (3) the degree of detail Ramirez provided, such as the amount of drugs and money passing hands; and (4) Cooper independently corroborated the critical portions of Ramirez' information, as the court discusses below. See Illinois v. Gates, 462 U.S. 213, 234 (1983) ("even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case"); United States v. Leidner, 99 F.3d 1423, 1429-30 (7th Cir. 1996) (informant's admissions against penal interest increases informant's credibility), cert. denied, 520 U.S. 1169 (1997); Jones, 208 F.3d at 608-09 (listing four factors to assess reliability of information from informant, when that information is included in search warrant affidavit as basis for establishing probable cause).

The Molinas do not take issue with the first and second factors, but do challenge the latter two. Rather than directly attack the degree of detail Ramirez gave regarding the drug transactions, however, the Molinas focus instead on some inconsistencies in Ramirez' two statements about the amount of drugs involved. They observe that Ramirez' estimations

fluctuated throughout his two interviews, saying sometimes he handled fifty pounds of marijuana per month, then backing off that number when asked if that meant he moved 600 pounds per year; similarly, Ramirez said early on in his first interview Raul was bringing in approximately a "kilo" of cocaine per week, but then later on in the same interview changed it to a "kilo" per month.  (Pl. Exh. B, pp. 4, 25; Pl. Exh. C, pp. 57-58)  The Molinas also see something suspicious about Ramirez pleading ignorance of what Raul did with the money he made off the drugs or who Raul's supplier was.  (Pl. Exh. C, p. 53)

None of this, however, comes close to satisfying the Franks standard.  That Ramirez could not pinpoint exactly the amount of drugs Molina was in charge of, or what he did with the proceeds, or who supplied him, is largely immaterial and ignores the real substance of what Ramirez did say as it related to the search warrant affidavit.  What was critical was that Ramirez repeatedly and consistently put Raul Molina at the top of a large drug conspiracy, gave detailed information about how the conspiracy worked and who the main players were, stated Raul operated the conspiracy in part out of his home in Sterling, where Ramirez said he personally visited Raul on numerous occasions, and saw cocaine in Raul's house.  Because the supposed "inconsistencies" in Ramirez' statements were of such "minimal significance," Cooper's failure to include them in the search warrant affidavit could not have reasonably affected the finding of probable cause.

See McNeese, 901 F.2d at 594; Forman, 104 F.3d at 964; see also Olson v. Tyler, 825 F.2d 1116, 1120-21 (7th Cir. 1987) (officer applying for search warrant is entitled to qualified immunity for intentionally or recklessly omitting a fact in a warrant affidavit if a reasonable officer could conclude that the withheld fact is irrelevant to probable cause). At the same time, the Molinas have utterly failed to show Cooper "entertained serious doubts as to the truth of" Ramirez' allegations or had "obvious reasons to doubt the veracity" of those allegations.[1] See Jones, 208 F.3d at 607 (internal quotations and citations omitted).

Finally, and perhaps most importantly, Cooper and Dail independently confirmed the main thrust of what Ramirez told them - that Raul was dealing cocaine out of his home. On July 3, 1998, just a few days before seeking the search warrant, Cooper and Dail, along with another officer, performed a manual search of the Molinas' garbage. (LR 56.1(a) ¶¶ 30, 40; LR 56.1(b) ¶¶ 12, 50) A number of items in the garbage field tested positive for cocaine. (LR 56.1(a) ¶¶ 31, 40; Def. Exh. 6) Although they do not dispute this, the Molinas nevertheless claim the field tests were "highly unreliable" because two of the positive field

---

[1] The Molinas in fact claim Cooper expressed doubts about "large portions of" Ramirez' "statements regarding Raul and marijuana dealing" (Pl. Resp., pp. 3, 8), but have seriously misquoted Cooper's deposition testimony and taken it out of context. What Cooper said was he doubted Ramirez' denial that Raul was part of a street gang. (LR 56.1(b) ¶ 19) This hardly shows Cooper doubted the rest of what Ramirez said.

tests from the night the Molinas' home was searched came back from the lab as negative, thus resulting in "false positives." Even so, the garbage search occurred *before* the search of the home (and, obviously, before the results of the lab tests were known), and the Molinas have offered nothing to show why Cooper and Dail should have doubted the reliability of the field tests *at the time* they performed the garbage search.

Taken together, the court finds the field tests from the garbage search and Ramirez' statements about Raul's involvement in selling and distributing cocaine from his home were sufficient by themselves for a reasonable officer in Cooper's position to believe probable cause existed for purposes of applying for a search warrant on the Molinas' home. Put another way, the Molinas have failed to make a "substantial preliminary showing" that Cooper intentionally or recklessly withheld material information that was necessary to the probable cause finding.

### 2.  **(Un)reasonableness of the search (Count III)**

In cursory fashion, the Molinas argue the actual search of their home was unreasonable because the officers did not comply with the "knock and announce" rule, see Wilson v. Arkansas, 514 U.S. 927 (1995), and it was "unnecessarily destructive." As for the first contention, the Molinas have failed to offer any competent evidence that the TRT did not knock and announce its presence before forcibly entering their home. Indeed, Jackie admitted she was asleep when the officers first arrived and only

-12-

awoke when she heard "screaming and yelling." At best, the screaming and yelling she heard were the officers announcing their presence; at worst, Jackie cannot say one way or the other whether the officers knocked and announced before entering as she was asleep at the time. With no evidence to dispute Simonton's testimony that the TRT knocked on the front door and called out three times, "Illinois State Police search warrant, open the door!," the court finds the TRT complied with the knock and announce requirement.

The Molinas also summarily complain the officers caused unnecessary damage to their home, such as breaking in the front and back doors, as well as the back door to the garage, and also damaged the hood of their pick-up truck parked in the garage. These claims, however, are too poorly developed to merit much discussion. The TRT was compelled to break in the doors when nobody answered after it had announced its presence. True, it was half past midnight and the officers only waited twelve to fifteen seconds from the time it first knocked to its breach of the Molinas' front door (LR 56.1(a) ¶ 63), but the Molinas do not argue they should have waited longer. Given that the TRT believed Raul had just gotten home from work, knocked and announced their presence three times without anyone answering, and had information to suspect there were drugs and guns inside the house, the court finds nothing unreasonable about the officers forcibly entering the Molinas' home and garage to

execute the search warrant.  See Wilson, 514 U.S. at 931 (knock

and announce rule forms only a part of the inquiry into the

reasonableness of a search); Woods v. City of Chicago, 234 F.3d

979, 993 (7th Cir. 2000) (same), cert. denied, 122 S. Ct. 354

(2001).

As for the dent in the pick-up truck, Jackie and Raul admit

they have no idea which of the seventeen officers may have caused

the damage.  (Pl. Resp., p. 11)  Raul even conceded the culprit

could have even been one of the children.  (LR 56.1(a) Pl. Resp.

¶¶ 6, 17(a))  The Molinas suggest Cooper might be to blame

because he recalled searching "for a short time" in the garage.

(LR 56.1(b) ¶ 25)  But to deduce from this that he is the one who

damaged the truck is sheer speculation and insufficient to

survive summary judgment, especially in light of Cooper's own

testimony that other unidentified officers searched the garage

before him.  (Pl. Exh., Cooper dep., p. 87)  See Hessel v.

O'Hearn, 977 F.2d 299, 304-05 (7th Cir. 1992) (defendant officers

entitled to summary judgment on claim that officers stole

plaintiffs' property during search of plaintiffs' home where

plaintiffs did not have evidence as to which of fourteen named

defendants were responsible for the theft).

### 3.  **Excessive force (Count I)**

Jackie, Chad, and Joshua originally alleged the officers

used excessive force against them on the night of the search when

they pointed a gun at them, knocked Jackie to the ground, put

handcuffs on her too tightly, and used flash-bang devices in the basement. (Am. Compl. ¶ 40)  Except for the flash-bang devices, which the court discusses below, these plaintiffs have apparently abandoned their excessive force claim, which is nowhere to be found in the Molinas' response brief.  There is a mention in their statement of additional facts that Jackie testified an officer held a gun to her face as she was lying down on the floor (LR 56.1(b) ¶ 94), but this is not pursued in the Molinas' memorandum of law.  The court thus considers the remainder of the excessive force claim waived.[2]

Whether the TRT's use of flash-bang devices to execute the search warrant constituted excessive force requires the court to examine the totality of the circumstances and determine whether the intrusion on the Molinas' Fourth Amendment interests was justified by the countervailing state interests at stake.  <u>See</u> <u>Graham v. Connor</u>, 490 U.S. 386, 396-97 (1989); <u>Jacobs</u>, 215 F.3d at 773.  The question is whether the officers' actions were objectively reasonable in light of the facts and circumstances confronting them.  <u>See</u> <u>Graham</u>, 490 U.S. at 397.

---

[2]  Even if the court were to consider the gun-pointing as part of the excessive force claim, it would reject it on the merits as well.  From a review of Jackie's deposition testimony it is clear the officer (whoever he was) briefly pointed the gun at Jackie just long enough to handcuff her, never threatened to pull the trigger, and stopped pointing the gun at her after she stood up.  (LR 56.1(a) ¶ 4; Def. Exh., Jackie Molina dep., pp. 21-24)  This brief show of force by itself is simply not enough to rise to the level of a Fourth Amendment violation.  <u>Cf.</u> <u>Jacobs v. City of Chicago</u>, 215 F.3d 758, 773-74 (7th Cir. 2000); <u>McDonald v. Haskins</u>, 966 F.2d 292, 294 (7th Cir. 1992).

Although various courts have expressed their concern over the use of flash-bang devices, also known as concussion grenades or distraction devices, see, e.g., United States v. Folks, 236 F.3d 384, 388 (7th Cir.) (collecting cases), cert. denied, 122 S. Ct. 74 (2001); United States v. Myers, 106 F.3d 936, 941 (10th Cir.), cert. denied, 520 U.S. 1270 (1997), the court finds the TRT's use of two flash-bang devices was objectively reasonable in this case. As the officers point out, the TRT was aware of the presence of the Molina children in the house and had already secured them on the first floor before tossing the flash-bang devices into the basement. (LR 56.1(a) ¶ 54) The only person not accounted for was Raul and, as noted above, the officers had reason to believe he had recently returned home from work. The officers also knew Raul was a suspected drug dealer and gang member and knew he had a criminal record including, among other things, aggravated assault. As the TRT officers previously had learned a collection of firearms were in the house, they may have reasonably thought Raul was holed up in the basement, armed and waiting for them to descend the stairs. (As it turned out, the search uncovered some guns in the basement. (LR 56.1(a) ¶ 68)) On the other hand, it is unclear if the officers simply tossed the flash-bang devices into the basement without performing a visual inspection of the room to make sure the devices did not injure anyone in its vicinity. Cf. United States v. Jones, 214 F.3d 836, 838 (7th Cir. 2000). But even assuming they did not

(and assuming it was physically possible to do so without actually going down into the basement), they still had their own safety to think about. From their perspective, simply walking down into the basement without the flash-bang devices potentially could have made them vulnerable to an armed and out-of-view suspect. Finally, though not conclusive, the court notes none of the Molinas were actually injured by the flash-bang devices. Given all of these circumstances as they were known to the TRT officers at the time they conducted the search of the Molina home, the use of flash-bang devices in this case was objectively reasonable.[3]

### 4. **Arrest (Count II)**

Jackie and Raul also argue their initial arrest on October 2 was without probable cause. This claim borders on the frivolous and deserves little attention. They admit the officers found inside their home three plastic balls filled with an explosive substance, brass knuckles (or, according to them, a belt buckle bearing an uncanny resemblance to a set of brass knuckles (Def. Exh. 3)), a switch blade knife, and a digital scale commonly used

---

[3] Alternatively, even assuming the TRT's use of the flash-bang devices was not objectively reasonable, the officers would still be entitled to qualified immunity on this claim because the Molinas have failed to show their right to not be exposed to flash-bang devices was clearly established when the search took place. Virtually all of the federal cases discussing the reasonableness of flash-bang devices are dated after July 1998 and the few that are not have held their use was reasonable. See, e.g., Myers, 106 F.3d at 941; United States v. Kingsley, No. 97-40095-01-RDR, 1998 WL 295577, at *4 (D. Kan. May 21, 1998).

by drug dealers. (LR 56.1(a) Pl. Resp. ¶¶ 7-9, 15-17, 20)  They
also do not dispute the lab test showed the residue on the scale
was cocaine.  (Id. ¶ 78)  Finally, although Jackie incredibly
asserts there was "no evidence tying her to any item of a
criminal nature" (Pl. Resp., p. 13), she completely ignores the
fact that she conceded the switch blade knife was taken from *her*
dresser drawer.  (LR 56.1(a) Pl. Resp. ¶ 8)  These facts alone
were more than sufficient to establish probable cause for the
arrests of Jackie and Raul on charges of possession of a
controlled substance, unlawful use of weapons, and possession of
drug paraphernalia.

B.    **Fourteenth Amendment**

1.    **"Selective enforcement" (Count IV)**

In Count IV, the Molinas alleged a claim under the Equal
Protection Clause of the Fourteenth Amendment that the officers
selectively enforced the law against Raul based on his Mexican-
American nationality and against Jackie based on her association
with Raul.  But because they do not so much as even mention this
theory in their response brief, let alone provide evidence to
support it, the court considers the claim abandoned.

2.    **False testimony (Count V)**

In their malicious prosecution counts, the Molinas allege
Cooper testified falsely at their preliminary hearings about the
substance found on the digital scale.  Because the charges
against the Molinas were dismissed before trial, it is not at all

-18-

certain whether their "false testimony" allegations are akin to a
due process claim in the "original sense of that phrase" of not
receiving a fair trial, see Newsome, 256 F.3d at 752, or are
really more of a Fourth Amendment claim.  See Jones v. City of
Chicago, 856 F.2d 985, 994 (7th Cir. 1988) (where police officers
deliberately supplied misleading information and thus influenced
prosecutor's decision not to drop charges but proceed to trial,
question whether the accused's continued prosecution is
unconstitutional passes over, "at some point after [the] person
is arrested," from the Fourth Amendment to the Due Process Clause
of the Fourteenth Amendment).  Cf. Newsome, 256 F.3d at 752-53
(plaintiff's allegations that defendant police officers withheld
material exculpatory details about fingerprints found at the
scene and a witness line-up stated a due process claim as the
violation occurred at trial); Williams v. Heavener, 217 F.3d 529,
531-32 (7th Cir. 2000) (where plaintiff alleged police officers'
false accusations formed basis of arrest warrant, plaintiff's
malicious prosecution claim could not constitute a violation of
the Due Process Clause of the Fourteenth Amendment, but instead
must be based on the Fourth Amendment); Corbett v. White, No. 00
C 4661, 2001 WL 1098054, at *5 (N.D. Ill. Sept. 17, 2001)
(plaintiff stated due process claim under Newsome by alleging
that defendant police officers fabricated evidence and withheld
exculpatory evidence from prosecutors when swearing out criminal
complaints against plaintiff).  No matter though.  However this

claim is dressed up, it is going nowhere.

When asked at Raul's preliminary hearing if he had observed any sort of substance on the digital scale during the original search, Cooper said there was a "gray substance" but could not say if "it was a powder or not." (LR 56.1(b) Def. Reply ¶ 29) In response to the same question at his deposition, Cooper testified he saw what he thought was "residue on the scale, a white powdery substance" that was "like a haze." (Id. ¶ 28)  The Molinas translate these answers to mean Cooper testified at the preliminary hearing he did *not* see any white powder on the scale, but then changed his story at his deposition and said he did see a white powder on the scale.

Besides taking Cooper's testimony at both the preliminary hearing and deposition out of context and giving it a rather tortured reading, numerous other problems plague the Molinas' "false testimony" theory.  First of all, whatever Cooper saw, there is no question that he saw *something* to justify sending the scale to the lab for further testing.  And as it is undisputed the lab test on the residue came back positive for cocaine (LR 56.1(a) ¶ 78), Cooper's testimony about what the substance looked like was ultimately not material to the state court judge's decision at the preliminary hearing.  What mattered was that the lab confirmed the substance was cocaine.  Second, none of this proves Cooper testified falsely at the preliminary hearing to begin with.  The fact that Cooper remembered the substance being

white at his deposition but gray at the preliminary hearing proves, at most, that Cooper was unsure what color it was. What it does *not* show is that Cooper lied - i.e., that he simply made up the story about seeing some sort of substance on the scale.

C.    **State Law - Malicious Prosecution (Count VI)**

The Molinas' state law malicious prosecution count is a mirror image of Count V and relies on the same supposedly false testimony Cooper gave at the preliminary hearing. Thus, for the same reasons discussed above with regard to Count V (see section III-B-2 supra), the court similarly finds Count VI is without merit. In addition, the court has already noted the various items found in the Molinas' residence during the original search provided more than enough probable cause to arrest them and bind them over for trial. As the absence of probable cause is a necessary element to any state law malicious prosecution theory, see Logan v. Caterpillar, Inc., 246 F.3d 912, 921-22 (7th Cir. 2001) (applying Illinois law), Count VI fails on this basis as well. Finally, the Molinas have failed to meet their burden on summary judgment of coming forward with any evidence that the prosecution was terminated in a manner indicative of their innocence. See Sparing, 266 F.3d at 692-93. Indeed, they actually have left unrebutted the officers' explanation for dropping the charges - that complying with the Molinas' discovery requests in their criminal case might have jeopardized another ongoing investigation. (LR 56.1(a) Pl. Resp. ¶¶ 44, 85)

## IV.  CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted.  This case is dismissed in its entirety.


E N T E R:


_PHILIP G. REINHARD, JUDGE_
**PHILIP G. REINHARD, JUDGE**
**UNITED STATES DISTRICT COURT**


DATED: _March 18, 2002_

# United States District Court
## Northern District of Illinois
### Western Division

Raul Molina, et al.

v.

Gary Cooper, et al.

**JUDGMENT IN A CIVIL CASE**

Case Number: 00 C 50230

☐  Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■  Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that defendants' motion for summary judgment is granted. This case is hereby dismissed in its entirety.

All orders in this case are now final and appealable.

FILED-WD
02 MAR 18 PM 2: 32
CLERK
U.S. DISTRICT COURT

Michael W. Dobbins, Clerk of Court

Date: 3/18/2002

Susan M. Wessman, Deputy Clerk